# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    **Plaintiff,**

           **v.**

RICARDO ALBERTO
VILLA-GUILLÉN [8],

    **Defendant.**

**Criminal No.** 16-526 (FAB)

## OPINION AND ORDER

BESOSA, District Judge.

Before the Court is defendant Ricardo Villa-Guillén ("Villa")'s motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"). (Docket No. 648.) Villa also moves for a new trial pursuant to Federal Rule of Criminal Procedure 33 ("Rule 33"). Id. For the reasons set forth below, Villa's motions are **DENIED**.

## I. Background

On June 23, 2017, a grand jury returned a one-count superseding indictment charging Villa, José Herrera-Olavarría, Richard Rodríguez-Heredia, Luis Rodolfo Mejía, Emilio González-Espinal, Cessy Martínez-Lantigua, Humberto Concepción-Andrades, and Richard Guerrero with conspiracy to possess with intent to distribute at least five kilograms of cocaine, in violation of 21

U.S.C. section 846.  (Docket No. 120.)[1]  The conspiracy occurred

between 2009 and December of 2012.  Id. at p. 1.  After a five-

day trial, the jury convicted Villa.  (Docket No. 625.)  The facts

are set forth in the light most favorable to the jury's verdict

and in a manner consistent with the trial record.  United States

v. Valerio, 676 F.3d 237, 240 (1st Cir. 2012); United States v.

Polanco, 634 F.3d 39, 40 (1st Cir. 2011).

## A. The Drug-Trafficking Organization

Villa and his cohorts established a sophisticated drug-

trafficking organization ("DTO") for the purpose of exporting

controlled substances from Puerto Rico to the continental United

States.  José Herrera-Olavarría ("Herrera") assumed a leadership

position within the DTO hierarchy.  (Docket No. 635 at p. 74.)  He

controlled the drug-trafficking route and hired "mules" to

transport cocaine on commercial flights.  Id. at p. 31.  The mules

earned $500 per kilogram for this service.  Id. at p. 15.

"Investors," including Herrera and Villa, purchased the

"material that [became] cocaine."  Id. at p. 48.  The DTO concealed

---

[1] Villa's codefendants pled guilty.  (Docket Nos. 188, 247, 268, 293, 416 and
434).  Emilio González-Espinal, Luis Rodolfo Mejía, Richard Rodríguez-Heredia,
and Humberto Concepción-Andrades received sentences ranging from 60 to 168
months imprisonment.  (Docket Nos. 234, 378, 516 and 521.)  José Herrera-
Olavarría, Cessy Martínez-Lantigua, and Richard Guerrero are awaiting
sentencing.  (Docket Nos. 668, 684 & 687.)  Cessy Martínez-Lantigua and José
Herrera-Olavarría were married during the course of the conspiracy.  (Docket
No. 635 at p. 29.)

approximately 20 to 25 kilograms of cocaine from various investors

in individual suitcases.   Id. at pp. 46 & 48.   A single kilogram

of cocaine garnered between $30,000 to $32,000 on the black market.

Id. at p. 62.

        To avoid detection by law enforcement, the DTO enlisted

the assistance of corrupt airline and government employees.

Passengers departing from the Luis Muñoz Marín Airport are required

to place their luggage through "agricultural scanners."   Id. at p.

33.[2]  An agricultural sticker would then be affixed on the luggage,

signaling that the suitcase and carry-on items are approved for

flight.   Id. at p 32.   As a security measure, the USDA alternates

the color of this sticker every day.   Id.   On the morning of a

"job," Herrera obtains the daily agricultural sticker from an

airport employee.   Id. at p. 30.   Herrera transfers the suitcase

and agricultural sticker to a mule.   Id. at p. 34.   Once at the

airport, the agricultural sticker would be placed on the suitcase,

and a pre-positioned "watcher" would call a corrupt Delta Airlines

("Delta") employee to describe the mule's appearance and clothing.

Id. at p. 34.   The corrupt Delta employee would then receive the

suitcase from the mule, who had been identified to him, at the

check-in counter.   Id.   A TSA agent, also on the DTO payroll,

---

[2] All luggage destined from Puerto Rico to the continental United States is
required to be checked by United States Department of Agriculture ("USDA")
personnel before it is allowed on a flight.

would subsequently permit the cocaine to pass through the X-ray machine without alerting the Puerto Rico Police Department ("PRPD") or the Drug Enforcement Agency ("DEA"). Id. Once the Delta employee ensured that the suitcase was on the airplane, he would signal the mule to board. Id. at p. 35.

Once in New York, a taxi driver transports the mule and the suitcases to a hotel for $400. (Docket No. 364 at pp. 135-136.) Various "buyers" purchase the cocaine at the hotel. (Docket No. 635 at p. 51.) The mules return to Puerto Rico with drug proceeds. Id. at p. 36. From 2009 through December of 2013, the DTO performed one to two "jobs" per month. Id. at p. 35. The investors made a profit of approximately $10,000 for each kilogram of cocaine. Id. at p. 50.

**B. Villa's Participation in the Drug-Trafficking Organization**

Villa and Herrera "grew up together in the same ward," maintaining a friendship into adulthood. (Docket No. 635 at p. 30.) Herrera initially hired Villa as a mule. Id. at p. 48. Villa transported between 20 to 25 kilograms of cocaine from Puerto Rico to New York on three occasions. Id. Subsequently, Villa "recruited mules" and "act[ed] as a watcher," solidifying his role within the DTO. Id. at p. 52. He also invested in "one or two kilos [of cocaine on] at least five trips." Id. at p. 49.

## C. Stolen Proceeds and Confiscated Cocaine

Herrera, Villa, and other members of the DTO experienced significant financial loss. Cocaine and large sums of money were stolen or seized on three occasions.

### 1. Law Enforcement Officers Seized 15 Kilograms of Cocaine from a Mule in New York

Herrera often hired taxi driver Harold Domínguez ("Domínguez") to retrieve mules from the John F. Kennedy Airport. (Docket No. 634 at p. 140.) Domínguez recommended that his friend, Arnold López-Cabrera ("López"), sell cocaine in New York on behalf of the DTO. Id. at p. 134. Herrera acquiesced, permitting López to sell three kilograms of cocaine. (Docket No. 635 at p. 54.) A buyer purportedly stole the cocaine from López. Id. Consequently, Herrera demanded that López work as a mule to "pay off his debt." Id.; Docket No. 634 at p. 134. Working as a mule, López then flew from Puerto Rico to New York with 15 kilograms of cocaine, two of which "belonged" to Villa as an investor. Id. at pp. 55 & 58. The DEA and New York Police Department ("NYPD") officers arrested López when he arrived at the John F. Kennedy Airport, seizing the 15 kilograms of cocaine. Id. at p. 57.

### 2. The Stolen $250,000

Herrera requested two mules in New York to "do [him] a favor" by transporting $250,000 to Puerto Rico. (Docket No. 635

at p. 60.)  Of this amount, approximately $30,0000 "belonged" to
Villa, the proceeds of the cocaine of which he had invested.  Id.
at p. 62.  According to the two mules, the suitcases containing
the $250,000 traveled on "another flight" and were empty upon
arrival.  Id.  Herrera, Villa, the two mules and others then met
to discuss the theft.  Id. at p. 61.  "Things got a little bit hot
. . . [because the investors] had doubt that the money hadn't been
stolen."  Id. at p. 62.  Villa suggested that the mules should die
"because of this loss."  Id. at p. 63.  Herrera rejected Villa's
advice, however, "[giving them] the benefit of the doubt."  Id.

### 3. Law Enforcement Officers Seize $296,014 from Villa in Florida

Guillermo Salas ("Salas"), a government informant,
notified the DEA that a person "interested in buying kilos of
cocaine" contacted a confidential source in Colombia. (Docket No.
634 at pp. 94 & 117.)  Salas contacted Villa, the prospective
buyer, to arrange the transaction.  Id. at p. 96.  Three days
later, Villa instructed Salas to meet him at the Dolphin Mall in
Doral, Florida.  Id.  At this meeting, Villa and two other
individuals showed Salas a large sum of United States currency.
Id. at p. 97.  The DEA recorded Villa's meeting with Salas.  Id.
at p. 99.  These recordings were not, however, introduced into
evidence by the United States.  Id. at pp. 100—102.

Pursuant to the DEA's instruction, Salas requested that Villa retrieve the cocaine at a warehouse. Id. Twenty minutes later, Miami-Dade Police Department ("MDPD") officer Guillermo Cuba ("Cuba") stopped Villa and his associates for an improper lane change. Id. at p. 109. A contraband detection dog present at the scene alerted to the presence of narcotics. Id. at p. 111. Cuba seized $296,014 "in quick-count bundles, which is normal for drug trafficking/money laundering activity." Id. at p. 118.

### D. Villa's Letter to the Court

The Court received a handwritten letter from Villa on May 13, 2019. (Docket No. 498.) At trial, the jury received a redacted version of this letter, stating in pertinent part:

> Honorable Judge Besosa, I extend the most cordial greetings to all the personnel of the courtroom you so well preside. I am writing you this letter amidst the legal proceedings I am facing. In many occasions, I have expressed my desire to reach an agreement with the Government. I am in the best disposition to make a fair, reasonable and intelligent agreement to agree and take the best decision regarding the same.

Docket No. 636 at p. 47.) The Court took judicial notice of Villa's letter, but instructed the jury that "the final decision whether or not to accept it is for you to decide." Id. at p. 48.

## II.  The Motion for Judgment of Acquittal

Villa moves for a judgment of acquittal, contending that the "evidence does not support [his] conviction." (Docket No. 648 at p. 25.)  The United States responded. (Docket No. 671.)

### A. Rule 29 Legal Standard

A court may set aside a jury's guilty verdict and enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.  See Fed. R. Crim. P. 29. In reviewing a motion for judgment of acquittal, a court must consider the evidence "in the light most favorable to the prosecution" and determine whether the "body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt."  United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999) (citations omitted).

Rule 29 motions require a court to "take into account all evidence, both direct and circumstantial, and [to] resolve evidentiary conflicts and credibility disputes in favor of the jury's verdict."  United States v. Valerio, 676 F.3d 237, 244 (1st Cir. 2012).  The First Circuit Court of Appeals has called this sufficiency of evidence challenge "a tough sell," United States v. Polanco, 634 F.3d 39, 45 (1st Cir. 2011), observing that defendants seeking acquittal on this basis "face an uphill battle."  United

States v. Pérez-Meléndez, 599 F.3d 31, 40 (1st Cir. 2010); accord
United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006) (referring
to the sufficiency of evidence burden as a "daunting hurdle[]")
(internal quotation marks omitted).

While the sufficiency of the evidence is at the heart of the
Rule 29 inquiry, deference to the jury's verdict controls the
Court's analysis.  To uphold the jury's guilty verdict, the Court
need only determine that the conviction "finds support in a
plausible rendition of the record."  See, e.g., United States v.
Shaw, 670 F.3d 360, 362 (1st Cir. 2012).  Ultimately, Villa must
establish that "the evidence is so scant that a rational factfinder
could not conclude that the government proved all the essential
elements of the charged crime beyond a reasonable doubt."  United
States v. Vázquez-Soto, 939 F.3d 365, 371 (1st Cir. 2019).

## B. The Evidence is Sufficient to Sustain Villa's Conviction

Villa maintains that a judgment of acquittal is warranted
for two reasons.  First, he alleges that the United States failed
to present sufficient evidence to sustain a finding of guilt beyond
a reasonable doubt.  (Docket No. 648 at pp. 25—29.)  Second, Villa
attacks the credibility of cooperating witnesses.  Id.  Both
arguments are unavailing.

### 1. Villa Fails to Address the Record in Its Entirety, Focusing Narrowly on Evidence Omitted at Trial

Villa's travel records and audio recording from his meeting with Salas are absent from the trial record. Id. at pp. 24—26. He argues that the omission of this evidence warrants judgment of acquittal. Id. In doing so, Villa presents a myopic view of the record, relying on the absence of specific evidence rather than addressing the totality of the proof offered at trial. See United States v. Rivera-Rodríguez, 617 F.3d 581, 599 (1st Cir. 2010) ("The fact that the government did not present certain kinds of evidence does not necessarily mean there was insufficient evidence for conviction.") (internal citation and quotation omitted); United States v. Ayala-García, 574 F.3d 5, 12 (1st Cir. 2009) ("We consider the evidence in its totality, not in isolation, and the government need not negate every theory of innocence.").

Herrera, the "main leader" of the DTO, provided detailed testimony regarding Villa's participation in the conspiracy. (Docket No. 635; Docket No. 636 at p. 15.) The jury observed a photo of Villa, Herrera and others at a social gathering, constituting corroborating evidence that the men knew each other. (Docket No. 635 at pp. 80—81.) The seizure of fifteen kilograms of cocaine in New York and $296,014 in Florida substantiates the trial testimony. The United States need not

introduce Villa's plane ticket and baggage claim to prove that he smuggled cocaine to New York. Salas' testimony established that Villa attempted to purchase 11 kilograms of cocaine from a Colombian drug broker. The omitted audio recording may have been sufficient, but was not necessary to prove this fact. See United States v. Gamache, 156 F.3d 1, 8 (1st Cir. 1998) ("The government need not produce direct evidence to meet its burden of proof: circumstantial evidence, if it meets all other criteria of admissibility, is just as appropriate as direct evidence and is entitled to be given whatever weight the jury deems it should be given under the circumstances within which it unfolds."); United States v. Caraballo-Rodríguez, 726 F.3d 418, 431 (3d Cir. 2013) ("A case can be built against the defendant grain-by-grain until the scale finally tips.") Defense counsel questioned Salas regarding the audio recording on cross-examination, casting doubt on the attempted drug transaction. (Docket No. 634 at p. 99.) The jury nevertheless convicted Villa. (Docket No. 625.) The Court will not disturb the jury's verdict. Accordingly, the trial record sufficiently demonstrated that Villa conspired to distribute cocaine despite the omitted airline records and DEA recordings.

### 2. Witness Credibility

Villa also challenges his conviction by impugning the credibility of government witnesses. (Docket No. 648 at pp. 25—

29.)  He claims that Salas testified "in his pecuniary interest to
maintain himself useful by giving information to the DEA."  Id. at
p. 25.  Herrera and Domínguez cooperated with the United States,
Villa argues, "to get a lower sentence."  Id. at p. 26.  Defense
counsel cross-examined Salas, Herrera, and Domínguez, exposing
potential biases and incentives to implicate Villa.  Indeed,
Herrera conceded that he "signed a cooperation agreement with the
prosecution . . . to get a lower sentence." (Docket No. 636 at p.
41.)  Credibility assessments are within the province of the jury.
United States v. Santos-Soto, 799 F.3d 49, 57 (1st Cir. 2015) ("We
do not assess the credibility of a witness, as that is the role
reserved for the jury.").  The Court is "not a thirteenth juror,
much less is he a super-juror whose views of credibility could
override the jury's verdict."  United States v. Freeman, 208 F.3d
332, 343 (1st Cir. 2000) (citation and internal quotation omitted).
The jury appraised and accepted Salas, Herrera and Domínguez's
testimony, rejecting Villa's contention that he "was not a member
of the drug trafficking organization." (Docket No. 637 at p. 43.)
It is not the Court's role to weigh the witness's credibility in
resolving a Rule 29 motion.  Because a plausible rendition of the
record supports Villa's conviction, his motion for a judgment of
acquittal is **denied**.

## III. The Motion for a New Trial

Villa also requests the "celebration of a new trial" because the Court allegedly committed a myriad of errors. (Docket No. 628 at pp. 1—21.)

### A. Rule 33 Legal Standard

The Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 motions are "sparingly" granted and only when "a miscarriage of justice would otherwise result." Fed. R. Crim. P. 33(b); United States v. Del-Valle, 566 F.3d 31, 38 (1st Cir. 2009) (internal citation and quotation marks omitted). Disposition of Villa's motion for a new trial is "committed to the sound discretion of the district court." United States v. Wright, 937 F.3d 8, 34 n.5 (1st Cir. 2019) (citation omitted).

The Court possesses "greater latitude in considering a motion for a new trial than it does in considering a motion for acquittal." United States v. Merlino, 592 F.3d 22, 33 (1st Cir. 2010). For instance, the Court may evaluate "whether its evidentiary rulings at trial were correct." United States v. Dimasi, 810 F. Supp. 2d 347, 362 (D. Mass. 2011) (citing United States v. Wilkerson, 251 F.3d 251, 279 (1st Cir. 2001)). A new trial is inappropriate, however, when the evidentiary error is harmless. Wilkerson, 251 F.3d at 280. Harmless error is "[a]ny

error, defect, irregularity or variance that does not affect substantial rights." Fed. R. Crim. P. 52(a).

## B. A New Trial is Not Warranted

Villa argues that a new trial is necessary because: (1) the Court permitted the United States to introduce the $296,014 seized in Florida; (2) the Court denied Villa's request to provide the jury with a multiple conspiracy instruction; (3) the jury convicted Villa without a paid informant instruction; (4) the Court erred by precluding impeachment by omission during the cross-examination of Domínguez; (5) the Court improperly limited the scope of Herrera's cross-examination; and (6) the Court erred in allowing the United States to introduce Villa's handwritten letter. (Docket No. 648 at pp. 1—21.) These arguments are unavailing.

### 1. The Seizure of $296,014 in Florida

Villa asserts that the Court erroneously permitted the United States to introduce evidence pertaining to the attempted drug transaction in Florida. Id. at pp. 2—6. He moved to suppress this evidence before trial, arguing that the MDPD seized the $296,014 in violation of the Fourth Amendment. (Docket No. 526.) The Court denied Villa's motion to suppress, holding that he failed "to establish a reasonable expectation of privacy in the area searched or the items seized." United States v. Villa-Guillén,

394 F. Supp. 3d 196, 201 (D.P.R. 2019) (Besosa, J.).

At trial, defense counsel objected to evidence of the $296,014 seizure. (Docket No. 634 at pp. 114—119.) In addition to the Fourth Amendment argument, Villa asserted that this evidence "is not relevant to the case inasmuch as there has been no link of this matter to the actual facts of what is charged" in the indictment. (Docket No. 634 at p. 115.) The Court overruled Villa's objection.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence [and] the fact is of consequence in determining the action." Fed. R. Evid. 401. Federal Rule of Evidence 403 ("Rule 403") requires the exclusion of "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; see also United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000) (internal citations omitted). The First Circuit Court of Appeals has emphasized that Rule 403 protects "against **unfair** prejudice, not against all prejudice." United States v. Whitney, 524 F.3d 134, 141 (1st Cir. 2008) (emphasis added); see also United States v. Bauzó-Santiago, 51 F. Supp. 3d 198, 199 (D.P.R. 2014) (Besosa, J.) ("In balancing the scales of Rule 403,

it is important to note that only unfair prejudice is to be avoided, as by design all evidence is meant to be prejudicial") (citation and internal quotation omitted). Pursuant to Rule 403, trial courts possess "considerable latitude in determining whether to admit or exclude evidence." Santos v. Sunrise Medical, 351 F.3d 587, 592 (1st Cir. 2003) (internal citations omitted). When the balance between the probative value and unfair prejudice of contested evidence is close, "Rule 403 tilts the balance in favor of admission." Whitney, 524 F.3d at 141 (internal citations omitted).

Villa argues that the $296,014 seizure is irrelevant because the conspiracy set forth in the indictment pertained exclusively to the transportation of cocaine from Puerto Rico to New York. (Docket No. 648 at p. 8.) The Court disagrees.

Villa misconstrues the allegations set forth in the superseding indictment. The superseding indictment does not restrict the scope of the conspiracy to the transportation of cocaine from Puerto Rico to New York. (Docket No. 120.) Rather, the superseding indictment alleges that Villa and his "co-conspirators traveled on commercial flights that departed from the Luis Muñoz-Marín Airport in Caroline, Puerto Rico to the continental United States with kilograms of cocaine concealed

inside suitcases." Id. at pp. 2—3. Indeed, the superseding indictment makes no mention of "New York."

The Florida incident occurred in March of 2012, during the timeframe of the conspiracy. (Docket No. 120; Docket No. 634 at p. 93.) That Villa attempted to purchase 11 kilograms of cocaine with thousands of dollars in cash is probative of his intent both to invest in cocaine, and actually distribute it. Consequently, the Court stands by its decision regarding the admission of the $296,014 seizure.

### 2. The Multiple Conspiracy Instruction

Villa contends that the "Court erred by not providing the jury [with a] multiple conspiracy instruction." (Docket No. 648 at p. 9.) He speculates that the jury conflated the alleged conspiracy to purchase cocaine in Florida with the conspiracy to transport cocaine from Puerto Rico to New York. Id.

A multiple conspiracy instruction serves to quell the "concern [that] jurors will be misled into attributing guilt to a particular defendant based on evidence presented against others who were involved in a different or separate conspiratorial scheme." United States v. Camacho, 851 F.3d 81, 86 (1st Cir. 2017) (citation and quotation omitted). This instruction is appropriate if, "on the evidence adduced at trial, a reasonable jury could find more than one such illicit agreement, or could find an

agreement different from the one charged." United States v.
Brandon, 17 F.3d 409, 449 (1st Cir. 1994).  When the evidence
"overwhelmingly demonstrate[es]" guilt, a multiple conspiracy
instruction is superfluous.  United States v. Hansen, 434 F.3d 92,
101 (1st Cir. 2006) (holding that the "district court did not
commit plain error [in refusing to provide a multiple conspiracy
instruction] as a reasonable jury could not have found more than
one illicit agreement or an agreement different from the one
charged").

        The First Circuit Court of Appeals' decision in United
States v. Balthazard is illustrative. 360 F.3d 309 (1st Cir. 2004).
The trial court provided the following instruction:

> [Defendants are guilty only if the United States proves
> beyond a reasonable doubt] that the agreement or
> conspiracy specified in the indictment, and not some
> other agreement, or agreements existed, between at least
> two people to manufacture, possess, or distribute 1,000
> or more marijuana plants.

Id. at 316.  The defendant requested that the instruction further
specify that "the question of whether there is a single conspiracy
or multiple conspiracies is one of fact for the jury." Id.  The
trial court denied the defendant's request.  In affirming this
decision, the Balthazard court held that the proposed "instruction
adds little to the court's instruction."  Id.

        Villa's argument regarding the multiple conspiracy

instruction is flawed for three reasons.    First, as discussed above, the charged conspiracy was not geographically limited to exportation of cocaine from Puerto Rico to New York.

Second,  the  instruction  that  Villa  requested  was substantially incorporated into the Court's instructions to the jury.  The Court instructed the jury that:

> To find the Defendant guilty of conspiracy to distribute cocaine with the intention of distributing it to other persons, you must be convinced that the Government has proven . . . beyond a reasonable doubt . . . **that the agreement specified in the superseding indictment, and not some other agreement or agreements**, existed between at least two people, not necessarily including the Defendant, to possess with intent to distribute cocaine . . . **In determining whether the Defendant was a member of the conspiracy, you should consider only his acts and statements**.    He  cannot  be  bound  by  the  acts  or declarations  of  other  participants  unless  it  is established that a conspiracy existed and that he was one the its members.

(Docket No. 637 at p. 13) (emphasis added).[3]  Villa proposed the following instruction: "[I]f the [jury finds] that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you may find that some other conspiracy existed." Id. at p. 25.

Like the trial court in Balthazard, this Court instructed the jury that it could not convict Villa for an uncharged conspiracy.

---

[3] Villa did not present evidence or testify at trial.  (Docket No. 636 at p. 54.)

(Docket No. 637 at p. 13.)  The instruction requested by Villa was redundant.  The Court's refusal to use the exact wording proposed by Vila is no reason to grant a new trial.  See United States v. Berríos-Bonilla, 833 F.3d 25, 32 (1st Cir. 2016) (holding that the court's rejection of language proposed by the defendant was not error where "the proposed instruction was substantially incorporated into the instructions the district court gave").

Finally, the evidence overwhelmingly proved that Villa conspired to possess with intent to distribute cocaine, that he did so as a mule, a watcher and ultimately as an investor. Accordingly, the risk that the jury convicted Villa for a conspiracy other than the one charged in the indictment is an unsubstantiated presumption.

### 3. The Paid Informant Instruction

Villa avers that the Court erred by denying his "request for [a] paid informant instruction when it was supported by the facts of the case." (Docket No. 658 at p. 12.)  He argues that Salas "receives an enormous monetary benefit from the government, which in turn creates a significant motive for him to develop cases [and] provide testimony." Id. at pp. 11—12.  At trial, defense counsel "[stated] for the record that [Villa] requested a paid informant instruction." (Docket No. 637 at p. 24.)  Villa failed, however, to submit a proposed instruction or expound on this

perceived deficiency.

The Court informed the jury about its duty to assess witness credibility. In relevant part, the Court instructed the jury that:

> You do not have to accept the testimony of any witness, no matter who presented the witness, if you find that the witness is not credible. You must decide which witnesses to believe and which facts are true . . . **You may want to take into consideration such factors as the witness' conduct and demeanor while testifying, any apparent motive or bias that they may have displayed, any interest you may discern that they may have in the outcome of the case**, any prejudice they may have shown, their opportunities for seeing and knowing the things about which they have testified, the reasonableness or unreasonableness of the events that they have related to you in their testimony, and any other fact of circumstance disclosed by the evidence that tends to corroborate or contradict their versions of the events. **The fact that a witness is employed by a Government does not by itself entitle such witness' testimony to be given more or less weight or credence than that of any other witness.** You are to judge the credibility of all witnesses fairly and reasonably, and you may consider any interest that each of them may have in the outcome of the case in determining the weight to be given to their testimony.

(Docket No. 637 at pp. 10—11) (emphasis added). An additional paid informant instruction is unnecessary. See, e.g., United States v. Griffin, 525 F.3d 71, 80 (1st Cir. 2008) (holding that "it is unlikely the court committed error simply by failing to include [the proposed jury instruction]. The court had already communicated this point" to the jury). Consequently, Villa's argument regarding the paid informant instruction is meritless.

### 4. The Cross-Examination of Harold Domínguez

Villa argues that his "Sixth Amendment and Due Process rights were hampered by the Court's denial to allow the defense to cross examine on Domínguez's omissions" at trial. (Docket No. 648 at p. 15.) Witness credibility is subject to impeachment pursuant to Federal Rule of Evidence 613, applicable "when two statements, one made at trial and one made previously, are irreconcilably at odds." Fed. R. Evid. 613; United State v. Richardson, 515 F.3d 74, 84 (1st Cir. 2008).

The First Circuit Court of Appeals has held that prior statements that omit "details in a witness's trial testimony are inconsistent if it would have been 'natural' for the witness to include the details in the earlier statement." United States v. Meserve, 271 F.3d 314, 320-21 (1st Cir. 2001). The standard for impeachment by omission is "an elastic one, because the naturalness of a witness's decision not to include certain information in an earlier statement may depend on the nuances of the prior statement's context, as well as the witness's own loquacity." Id. at 312 (internal citation and quotation omitted). The propriety of allowing impeachment by omission "lies within the sound discretion of the district court." Umdemba v. Nicoli, 237 F.3d 8, 18 (1st Cir. 2001); Meserve, 271 F.3d at 312 (holding that "the district court did not abuse its wide discretion by refusing to

allow [the defendant] to cross-examine Grant regarding the
omission from her grand jury testimony of certain details about
which she testified at trial").

Defense counsel attempted to impeach Domínguez with an
alleged omission in his grand jury testimony. (Docket No. 634 at
pp. 164—170.) At the grand jury proceeding, the United States
asked Domínguez: "How do you know [Villa?]" Id. at p. 164.
Domínguez answered: "[Villa] was sent as a mule to get some money
. . . approximately only once." Id. at p. 164.

Defense counsel asked Domínguez at trial: "[Y]ou did not
say that [Villa] was – that you saw him with narcotics. You didn't
right?" Id. at pp. 166—67. The following conversation occurred
at sidebar:

> **Defense Counsel**: Okay, Your Honor. Let me say this: He
> was asked – this is a particular thing that [Domínguez]
> says, that he was a mule. He was asked about that. And
> that [Villa] took kilos. And he already says he was a
> mule to get money. Not kilos. And that's important.
> So I can ask him that he really said that he moved kilos
> because it's right here. He said [Villa's] a mule to
> get money. He didn't say he's a mule to get kilos.
>
> **Prosecutor**: Judge, if he had –
>
> **Court**: Wait a minute. Wait a minute. Wait a minute.
> You can ask him if he was sent by a mule to get some
> money, but you can't –
>
> **Defense Counsel**: Your Honor –

> **Court**: Excuse me.  You cannot ask him whether that means that he didn't bring any drugs, because that's impeachment by omission . . . You can ask him "Did [Villa] bring drugs?"  But you can't say "You didn't say that in the Grand Jury."

Id. at pp. 168—69.

The question "how do you know [Villa]?" does not call for an exhaustive account of every encounter between Domínguez and Villa.  Accordingly, the Court did not abuse its discretion in proscribing Villa's attempt to impeach by omission.

### 5. The Cross-Examination of José Herrera-Olavarría

Villa seeks a new trial because the Court denied his request to question Herrera regarding alleged violations of his pre-trial release conditions.  (Docket No. 648 at p. 17.)  On September 2, 2016, Magistrate Judge Bruce J. McGiverin released Herrera on bail, ordering that he: (1) "not violate federal, state, or local law," (2) remain at his "residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits [and] court appearances."  (Docket No. 29.)  Herrera and Cessy Martínez-Lantigua ("Martínez") separated after the commencement of this criminal action.

The United States Probation Office ("U.S.P.O.") informed the Court that on May 7, 2018, the Commonwealth of Puerto Rico Court of First Instance issued an protective order against Herrera

on Martínez's behalf. (Docket No. 280 at p. 2.) Consequently, the Court modified the conditions of Herrera's release by prohibiting him from having "any type of contact with [Martínez]." Id.; Docket Nos. 281 & 299.

Less than a month before trial, the U.S.P.O. notified the Court that "events transpired in Ms. Martínez's residence" involving Herrera. (Docket No. 563 at p. 1.) Magistrate Judge McGiverin rescinded Herrera's bond on November 1, 2019, and set a revocation hearing for November 6, 2019. (Docket Nos. 637 & 632.) Villa's trial ended on November 1, 2019. (Docket No. 622.) At the revocation hearing that followed, "[d]efense counsel informed that [Villa] would not object to his bail being revoked pending his sentencing hearing." (Docket No. 640.) Defense counsel argued at trial that the alleged violation of pre-trial release "goes straight to [Herrera's] credibility or mendacity" and bias. (Docket No, 636 at p. 6.)

### a. Truthfulness

Villa argues that Herrera deceived the U.S.P.O by visiting Martínez's residence. (Docket No. 635 at p. 96.) Federal Rule of Evidence 608 ("Rule 608") provides that:

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to the

inquired into if they are probative of the character for
truthfulness or untruthfulness.

Fed. R. Evid. 608(b).[4]  Violations of pre-trial release do not,

without more, implicate a witness's character for truthfulness.

United States v. Montrose, 15 Fed. Appx. 89 *90 (4th Cir. July 27,

2001) ("The court similarly found no dishonesty involved in the

second witness's violation of probation.  We find no abuse of

discretion in this finding."); United States v. Colella, Case No.

88-538, 1989 U.S. Dist. LEXIS 9160 *9—10 (E.D. Pa. Aug. 1, 1989)

("This court does not believe that Pott's failure to appear at

Colella's first trial, alleged violations of probation, or

contempt of court bear on his truthfulness within the meaning of

[Rule 608].").

### b. Bias

Generally, "pending charges are relevant to show

pro-government bias on the part of the testifying witness, on the

theory that the witness might tailor her testimony to please the

prosecutor, in exchange for a promise of leniency on the pending

charges."  Stephens v. Hall, 294 F.3d 210, 224 (1st Cir. 2002).

---

[4] Villa disclaimed that he "was bringing [the violation of pre-trial release]
as a conviction." (Docket No. 636 at p. 5.)  Pursuant to Federal Rule of Evidence
609, evidence of a felony conviction "must be admitted, subject to Rule 403, in
a civil or criminal case in which the witness is not a defendant."  Fed. R.
Evid. 609(a)(1)(A) see United States v. McElhiney, Case No. 02-938, 2007 U.S.
Dist. LEXIS 104975 *15 (C.D. Cal. Feb. 26, 2007) ("[S]upervised release
violations are not felonies, so they are not admissible pursuant to Rule 609.").

Restrictions on cross-examination are proper, however, "to prevent undue prejudice, confusion of the issues, witness badgering, redundancy, or questioning that appears to be of marginal relevance." United States v. Berríos-Bonilla, 822 F.3d 25, 31 (1st Cir. 2016) (citing Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). The Court possesses "wide latitude" to "set reasonable limits on cross-examination." United States v. Corliss, 919 F.3d 666, 669 (1st Cir. 2019). "Restrictions on cross-examination regarding bias are erroneous only if they are manifestly unreasonable or overboard." United States v. Martínez-Vives, 475 F.3d 48, 53 (1st Cir. 2007) (citation omitted).

Here, the Court exercised its sound discretion in limiting the scope of cross-examination pertaining to allegations of which there had been no findings. Pursuant to these circumstances, the Court exercised its sound distraction to prevent a mini-trial within the trial that would confuse the issues before the jury. See United States v. Gilbert, 229 F.3d 15, 24 (1st Cir. 2000) (affirming exclusion of extrinsic evidence because "there would be a mini-trial on whether the [act] actually took place"); United States v. Jiménez-Bencevi, 788 F.3d 7, 21 (1st Cir. 2015) (holding that the "Confrontation Clause does not give a defendant the right to cross-examine on every conceivable theory of bias")

### 6. Villa's Letter to the Court

Villa argues the letter he mailed to the Court is inadmissible and irrelevant. (Docket No. 648 at p. 19.) His letter states in full:

> I am writing to you this letter because I am going through a bad time with a lot of frustration amidst the legal proceedings I am facing. I respectfully and heartily request the notification of the decision made regarding the Suppression Hearing [in Case No. 17-608]. On many occasions, I have expressed to my legal representation my desire to reach an agreement with the Government. I am in the best disposition to make a fair, reasonably and intelligent agreement once I know the Suppression of Evidence to agree and take the best decision regarding the same.

(Docket No. 536 at p. 4.) Villa moved to exclude this letter pursuant to Federal Rule of Evidence 410 ("Rule 410") and Federal Rule of Criminal Procedure 11(f) ("Rule 11(f)"). (Docket No. 522 at p. 4.)

Rule 11(f) provides that the "admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410." Fed. R. Crim. P. 11(f). Rule 410 precludes the admission of statements "made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea." Fed. R. Evid. 410(a). Rule 410(a) applies exclusively to "a statement made during plea discussions **with an attorney for the prosecuting**

**authority**." Fed. R. Evid. 410(a)(4) (emphasis added). Villa addressed and mailed the letter to the Court, not to "an attorney for the prosecuting authority." See id.; Docket No. 543; see also United States v. Pérez-Franco, 873 F.2d 455, 461 (1st Cir. 1989) (finding that Rule 410 "has been consistently interpreted by the courts to protect only those statements made by a defendant to the prosecuting attorney himself"). The Court concluded that Villa's letter falls beyond the purview of Rule 410. See United States v. Bauzó-Santiago, 867 F.3d 13, (1st Cir. 2017) (affirming the admission of a letter the defendant mailed to the court).

The letter is relevant because Villa's assertions convey a consciousness of guilt. Being represented by counsel, Villa filed an incriminating letter to the Court on his own accord. (Docket No. 648.) By doing so, Villa assumed the risk that the letter would be used against him. Consequently, the Court did not err in holding that letter was admissible as an admission by party-opponent. Fed. R. Evid. 801(d)(2)(A); see United States v. Shrader, No. 09-270, 2010 U.S. Dist. LEXIS 65806 *12 (S.D.W. Va. July 1, 2010) ("The fact that the Court will not consider Defendant's pro se motion does not mean that the motion is not a party-opponent admission. Therefore, pursuant to Federal Rule of Evidence 801(d)(2)(A), the Court finds that the motion is admissible.").

## IV. Conclusion

For the reasons set forth above, Villa's motion for judgment of acquittal is **DEINED**.  (Docket No. 846.)

The Court initially set Villa's sentencing for March 15, 2020. (Docket No. 658.)  In response to the Covid-19 pandemic, the United States District Court for the District of Puerto ordered that "[a]ll civil and criminal proceedings in the District of Puerto Rico are continued until April 15, 2020." Order Regarding Virtual Courtroom System, Misc. No. 20-0088 (GAG) (D.P.R. Mar. 24, 2020). Accordingly, Villa's sentencing hearing has been continued pending further Court order.  See Docket No. 689.


**IT IS SO ORDERED.**

San Juan, Puerto Rico, March 28, 2020.

s/ Francisco A. Besosa<br>
FRANCISCO A. BESOSA<br>
UNITED STATES DISTRICT JUDGE